The final case on the call of the docket is agenda number 24. Case number 129081. Is the attorney for the appellant prepared to proceed? Please proceed, counsel. May it please the court, Kim Jansen here on behalf of the defendants. What we're dealing with here is a claim brought against the defendants based on comments they made in a press release on their website to the press following a public jury trial at which they talked about what happened at the public jury trial. Once plaintiff put his entire mental health history into the public record at that medical malpractice trial, it ceased to be confidential information. We all know trials are public. Nothing in that medical malpractice case was sealed. The underlying medical malpractice case was not brought under a fictitious name. In fact, neither was this particular action initially. It was brought under a fictitious name after a briefing in the appellate court had completed. Under this court's opinion in Novak, that's really the beginning and end of the story. As this court said in Novak, once information is publicly disclosed, that disclosure takes away, once and for all, the confidentiality sought to be protected by the privilege. Plaintiff has never alleged and has never argued that the academy defendants made any statements, press release, publication following the verdict in the jury trial that revealed any information that had not been already revealed in the course of that jury trial. He had plenty of opportunity to make that claim if it were true. He could have, in fact, needed to have alleged it in the complaint but did not do so. He had the opportunity in responding to the motion to dismiss and in his cert reply to the motion to dismiss. Two appellate briefs and even in this court had two opportunities to present briefs where if there was one fact, a single fact in any of those statements made post-verdict that was not already revealed at the jury trial, he had the opportunity to say so. The appellate court suggested that the existence of a HIPAA order in the underlying medical malpractice case distinguishes this from Novak. And, of course, HIPAA didn't exist yet when Novak was decided, although it did exist when Norskag v. Field followed Novak. But the HIPAA statute and the Qualified Protective Order entered pursuant to HIPAA doesn't change anything. For one, the Qualified Protective Order explicitly is limited to information received from a covered entity. The Qualified Protective Order specifically cards out that it does not apply to information received from any source other than a covered entity. And as plaintiff himself has noted multiple times in his briefs, there's no allegation as to where the cabinet defendants or their predecessor counsel obtained any of this information. He does concede that they necessarily would have received information from the plaintiff himself, from his medical records, depositions, et cetera, et cetera. But none of that suggests that the information he received or that they received was received pursuant to the Qualified Protective Order. In fact, the fact that the case was pending for, I think, eight months, the medical malpractice case, before the Qualified Protective Order was entered, I would assume his trial lawyers, the initial trial lawyers in that case, would have had access to the medical records, would seem virtually impossible. It would be impossible to attach a Certificate of Merit if you hadn't already had access. Does this disclosure, though, go against the spirit of the Act? It does not. It does not. Because it's, you know, it's the same situation in NOVAC in the sense that you have your mental health information is protected. Absolutely, it's good public policy to encourage, you know, candor in the treatment room. But you also have the right of access to the courts, and that presents a choice to the recipient of mental health care. A plaintiff could have kept all of his mental health information confidential by not filing the medical malpractice suit. I think it's perfectly understandable that he chose to file that suit. Absolutely. It's a valuable right. But choosing to pursue litigation comes with costs. Anyone who brings a case to trial, who files litigation, is sacrificing some element of their privacy. Counsel, you filed a 2615 motion to dismiss, I suppose essentially arguing that Mr. Doe cannot state a cause of action. Is that because of NOVAC? Yes, because of NOVAC and because of the construction of the statute. So the statute specifically protects only records and communications that are made or created during and in the course of providing mental health or developmental disability services. Once plaintiff testifies at trial, the information that's already been revealed at trial is not information made or recorded in the course of providing mental health services. It's information that is made, communications and records made and recorded in the course of litigation. Counsel, do we still have a question here whether or not there was information communicated that was outside of what came out during the trial? That has never been alleged and that is plaintiff's burden to allege that. If he wants to allege a violation of the Mental Health and Disabilities Act, it's his burden to say they actually revealed something that remained protected. I'm sure when pretrial discovery is going on, there are probably stacks and stacks and boxes of records that attorneys go through. Not everything ends up in front of a jury. Not everything ends up filed in court. If there are things that stayed in the box and were determined irrelevant to the proceedings, those will probably stay protected, I believe. But once it's introduced at trial, it loses the protection. That's under NOVAC and it's also because once it's introduced at trial, the source of the information becomes the trial itself. So as for the statutory construction, again, it's not whether or not the defendants are therapists. That's not the test. It's whether the information in question is a record or communication made or kept in the course of providing mental health services. Here, we're not dealing with that sort of information. Whatever information was received that was protected was then, with authorization, both under the Confidentiality Act and under HIPAA, presented at trial. But again, once it goes to trial, it is no longer... trial evidence is not a record kept in the course of mental health services. As far as the amendment to the statute, you know, I did spend several pages explaining why it shouldn't apply retroactively and I still think that's pretty clear under the existing law. But it doesn't really matter because even though the amendment adds this definition of what a therapeutic relationship is and says that, you know, these materials don't need to be made in the course of a therapeutic relationship to be protected, even in that added language, the legislature was careful to make clear that it was... it still had to be records or communications made or kept in the course of providing mental health services. If the court has no further questions, I would simply ask that you affirm the trial court and reverse the appellate court. Thank you, counsel. Good morning, counsel. Good morning, Your Honor, all of you. Tom Harris on behalf of the plaintiff appellee. My voice isn't what it should be this morning, so I have a little hot water that I may need to use on occasion. Why is medical privacy important and why is mental health privacy important? I think this court has answered those questions repeatedly, most notably more than 20 years ago in Norson says that the act is a strong statement by the General Assembly. Effective psychotherapy depends on confidentiality. People will avail themselves of needed treatment if they're confident that their privacy will be protected. Those statements about mental health are as heavy as true today as they were more than 20 years ago. Just a couple of years ago in Hague, you proclaimed that confidentiality of personal medical information is without question at the core of what society regards as fundamental to the component of individual privacy. Mr. Harris, I think we can all agree that protection of mental health records is a very high concern. But in this case, the plaintiff in the original case, didn't he consent to the release of all of that information when he participated in a public trial where all of this information became part of the public record? On a limited basis, and that goes to the Novak question that's perhaps the biggest question that is here and not the quick question. The heart of Novak is waiver, and I think that's the heart of what your question is, is waiver. There was a qualified protective order in this case that made very clear the limits of waiver. And of course, as you all know, waiver involves intelligent, knowing, intentional relinquishment of a right. So plaintiff, no question about it, brought a case and his mental health was certainly front and center and he waived his rights for those proceedings. And that's what the court order says. And so in order to say that the trial of this case now is free game, you really have to essentially eviscerate the concept of waiver. Novak involved a criminal matter, of course, as you know. And the statute specifically provides if one is going to assert the insanity defense, all bets are off. It's open. That is not what happened here. We have a qualified protective order that says for the purposes of the litigation, the allegations of the complaint taken as true are that the statements that were made were made outside of court, outside of the litigation. So that's... But didn't the qualified protective order simply allow the parties to access the protected information through formal discovery? Didn't seal the trial, didn't make anything protected in terms of... The trial was public. There was, so far as the record reveals, there was nobody there but the litigants and their lawyers. He is not a public figure. He has never been a public figure. The only time he became a public figure, if you will, is after this trial when the Sun Times and the Law Bulletin and the social media accounts lit up with respect to this. So had someone been there, a public person been there, and they talked about the evidence after the trial, would they have violated? That's a troubling question. The First Amendment sort of issue that has been raised in here. And frankly, on this record, I don't think there's a good answer to that question. Here we have a lawyer who unquestionably was controlled by the qualified protective order. In order of the court, she knows what it means. She knows what it meant. So if a juror or a bypasser happened to listen in or sit in on this trial and then told their neighbors, honestly, that hypothetical can go on and on and on. And this record really doesn't give us a good answer to that. What about a newspaper reporter? So often they do sit in during the course of a trial and then later report on exactly what happened during the course of the trial. The evidence that was presented, would a reporter be in violation of the act? Of course, it didn't happen here. And again, I recognize that is a big and troubling question in this case. But here's the problem with trying to answer that question with this case. We have decades of law under the Mental Health Act, and that question has never been considered by any case. And now we're here on a motion to dismiss standard. And if we're going to try to answer those hypothetical questions, which are not part of this record whatsoever, frankly, I think it not only puts in doubt what's going on here, but potentially, depending on how that decision would be written, it could frankly eviscerate or at least modify a great deal of law that a lot of people have relied upon for a long time, including Amicus Counsel, who has supported the Appalachian case. Judge, counsel, are you asserting that somehow this private information that was disclosed at a public trial regains its confidentiality after the trial is over? I'm very specific about what I'm alleging here. And it's under the Mental Health Act, not statements necessarily made at trial. Statements that she made that she knew about from mental health records. And that's an important distinction here. And do those statements come out at trial? The record that we have is not specific about that. And here's why I think this is a really important point for you to consider. If her statements, and this, again, we're at a motion to dismiss standards, if her statements, if she could say this statement I made to the Sun-Times is tied to this page of the transcript, that may not be covered under the Mental Health Act, and it wasn't in a record. But in order for her to do that, she's going to have to basically admit that she's breached fiduciary duties in disclosing confidential information. Now, if that happens at trial, I'm going to direct a verdict, because if we go back, or however we're going to deal with this still pending breach of fiduciary duty matter. So what this complaint is about, count one of the complaints, not the rest of the actions, which one remains, is about statements tied to the mental health records. It's an important distinction, because here the Qualified Protective Order governed what she could and couldn't say what she learned from those records. Now, if the defense eventually turns out to be, well, everything I said came from his lips, not from this expert, this doctor, this defendant, then, again, the other side of that coin is breach of fiduciary duty. So waiver, going back to really this question of waiver that Novak presents, it's not a criminal case. The statute does provide for criminal matters. But as I'm just trying to point out, there's a lot of factual assumptions in this defense. Counsel, so that I'm clear, you're essentially arguing that Doe did not waive his claims under the Act by publicly testifying at that medical malpractice trial. Is that correct? I'm not clear on the question. He testified about his own mental health, no question about that. And there were some other people that testified, correct? Obviously, lots of doctors and experts, yes. But he didn't waive his rights under the Act by doing so. On a qualified, limited basis, he knowingly, intentionally waives his rights. And the court order provides that. It doesn't provide a free-for-all. It provides that you may use it as part of this litigation. The post-trial statements are not part of the litigation. They're just not. Are you drawing a distinction between what Doe said in his own words at trial as he testified and what other experts or therapists said? Are you drawing a distinction between those pieces of information? The distinction that I'm drawing is what the defendant knew from his words as opposed to words that are obviously protected under the Mental Health Act. So she could, you know, irregardless of the Mental Health Act said, John Doe said this at trial. That specifically is not a violation of the Act. It is a breach of fiduciary duty, by the way, and I don't think she's ever going to say that. And again, motion to dismiss, Andrew. But when she makes statements that are tied to facts outside of what John Doe has said and what she knows from the voluminous medical records in this case, yes, then she is violating the Mental Health Act. And though it seems a point that's not that significant now, though it was years ago, and that is whether or not there's some exemption or workaround because there's not a therapeutic relationship. I think the appellate court did an excellent job of explaining that QUIG is not really well-founded and there is no non-therapeutic exception to the Act. Anybody who has learned this in the way she did through a qualified protective order cannot use them outside of the litigation. You can use them in the courtroom. You can use them in depositions. You can use them, I don't know, in many ways, but not for purposes outside of litigation. And that's what the complaint alleges, that those statements are tied to mental health records and she's using them outside of the courtroom, outside of litigation. I want to address perhaps something that's going on inferentially in the back of your mind, and that is, should my client be satisfied? He received a significant verdict and that should be enough for him. He should go along and peaceably live his life after this. I would suggest to you that, first of all, all the facts are not known, including posts that are not part of this record. I mean, they're known, but not in this record, about what happened after that verdict and the eventual complete result. But as concerns the inference, the suggestion that my client is somehow greedy and he's got enough and he shouldn't really be suing his lawyer who otherwise did a good job, the record does not tell us, you know, in terms of is this one-time specials, one-and-a-half-time specials. And so greed that may be in the back of your mind should not be. And, by the way, to the extent you ask yourself that question, please ask it of all the parties as to why this statement was made. And why, you know, why we're all here and was this really needed or necessary for anyone? This was, what, just a victory lap? I'm sorry? Was this a victory lap for the attorneys, I mean, basically? Well, I think it is a victory lap. I think it's publicity. I mean, when you put stuff out on your social media websites, you're doing it for obvious reasons to enhance your standing in the community. And our reputations as lawyers and judges are very important. And so I just, I don't think it's a central issue to the case. I raise it because I know, I suspect that one day I'll deal with it in a jury, and we're all people. And as I've handled this case, I know that people have said that to me. And that is a very limited, myopic, and actually somewhat ignorant view because all the facts, if they were known, would not lead you to that conclusion. Mr. Pierce, can I ask you if the later amendment to the Act to Section 3A in any way affects this case? Well, I think the amendment can only be tied to quid. That's where this phrase of therapeutic relationship comes up, and that's what the amendment talks about is, okay, you don't need a therapeutic relationship. So where else or why else would that amendment have been put in place but for quid? So I think it's a modifier of quid. I don't think it's a substantive right that has been taken away from the defendant. The defendant did not have a right to go brag about my client's, talk about my client's medical condition. So as before, the Mental Health Act can be amended, and it's retroactive. So I think the language that was part of the Act certainly covered this, but the amendment unquestionably covers it because it says you don't need a therapeutic relationship. So that would not be a useful place to decide the case, is that the defendant did not share a therapeutic relationship, and therefore she's not liable. We touched on the First Amendment, and I just want to stress again, this is not the case. This is not the time. This is not the place to try to wrestle with hypothetical questions that, honestly, until the amicus brief was filed, never even brought up. I recognize that the First Amendment, well, it's first for a reason, and it's important to us all, and I'm not trying to squelch anybody's rights. However, courts limit what lawyers and litigants can do all the time, especially lawyers, and that's what this is. I mean, qualified protective order in this case is a limitation upon speech. It's prior. If we even speak, it tells you that you can't speak. So courts have the ability to control who's in and out of the courtroom, what can be said. We do that in cases of mental health. We do that in guardianship cases. We do that when it's necessary. And so while there is that issue, that question is out there, I'd say, I don't think you should try to tackle it on this record because doing so is probably going to lead astray important rights that this court, the legislature, and others have long protected because, as you mentioned at the very beginning, when I just tried to waive the mental health line, they are important, and I wouldn't want this case to stand in the way of others' rights because of a hypothetical situation that is not really fully articulated anywhere in the record. That's all I have. Thank you, counsel. Thank you. So realizing that I am now on the rebuttal for the last argument on the last day of the court's call, I will try to keep this brief. This appeal is not about regulating attorney behavior. I know counsel kind of wound up, racked things up at the end with that, that, oh, you know, we can regulate attorney behavior all the time, and there are all sorts of limits on attorney behavior. This isn't about attorney behavior. As he referenced, he does have a breach of fiduciary duty claim that he has since refiled following the voluntary dismissal to the extent that, you know, what is or isn't proper for an attorney to do is relevant. It's relevant in that proceeding, not this one. This is about the Mental Health and Developmental Disabilities Confidentiality Act, and under that act, information is either confidential or it's not confidential. It can't change back and forth depending on who's talking about it. So it can't be confidential when a lawyer talks about it, but not confidential when the law bulletin talks about it. And this was a public trial, and I know counsel represents that there wasn't a big audience for the trial, that there weren't a lot of observers. I don't know. I wasn't there. There were certainly 12 jurors, probably a couple of alternates, I'm imagining. There was certainly a court reporter. The records remained public and open to the public, anyone who wanted to go look it up. It doesn't become confidential depending on how many people sitting behind the bar to watch the trial. It's public because trials are public. Court records are public. Counsel, I asked a question of opposing counsel about whether or not this was information that didn't come out at the trial, and of course his response was that the statements are from the mental health record, not testimony from trial. Is that true? There has never been any allegation to that effect. As far as I can tell, no. We do have the, attached to his complaint, he has the press release, the Sun Times story, the law bulletin story, attached to our motion to dismiss, we have his trial testimony. We don't have the entire trial transcript. But I'm not aware of anything, anything that came out in any of those statements to the press that wasn't already in the public record as part of the trial. Counsel has not identified anything. And again, he had two chances in this court. Typically an appellee only gets one. He had two chances to identify that for you, and he hasn't done so. In fact, I guess three because now we've had oral arguments. So if there was information that came from somewhere other than, or I shouldn't say came from, that wasn't already made public at trial, it's his job to let you know that. And he hasn't. And I think that speaks strongly to the reality that there wasn't anything that wasn't part of the trial record. As far as whether the QPO, the Qualified Protective Order, places limits on the scope of a waiver, that's not at all what the Qualified Protective Order says or does. It does place limits on the use of information that is received by the parties and their attorneys pursuant to the Qualified Protective Order. But it doesn't limit the consequences of those uses. So, for example, the Qualified Protective Order explicitly authorizes use of that information in reasonable connection with the litigation, such as from either side presenting it as evidence at the medical malpractice trial. Once it's been placed into evidence, NOVAC controls. NOVAC was abundantly clear that once that public disclosure is made through trial testimony, confidentiality is lost. You can't recover it. You can't claw it back. It's gone. As for the amendment and Quig, the idea that it's in response to Quig seems a bit of a stretch. Quig was decided in 2009. The amendment was not passed until 2016. So if it's a response to Quig, it's certainly a very delayed response. As for the therapeutic relationship angle, I honestly don't believe that the legislature and its amendment is really using therapeutic relationship the same way Quig was, and perhaps to some extent maybe they were trying to clarify how people should understand it. But I think if you read Quig, I think it's consistent really with what I've been arguing here. When they refer to a therapeutic relationship, they're referring to that language from the statute, both pre- and post-amendment, referring to records and documents and communications made or kept during and in the course of providing mental health services. They shorthanded that as therapeutic relationship. The legislature has now made clear, like, okay, therapeutic relationship doesn't mean just therapy. Like, we're not limiting the protection to it being a therapist who's providing the services. Services can be provided by a whole host of people. So that, you know, to the extent that the amendment changes what it means to be a therapeutic relationship, fine. But it doesn't really change what Quig said, which is really just drawing on that language that it has to be connected with during and in the course of mental health services. And with that, if the Court has no further questions, again, I ask that you affirm the trial report and reverse the appellate court. Thank you, counsel. Thank you. Case number 129081 is taken under advisement as agenda number 24. We thank the attorneys for their arguments today.